UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------- x
                                :

ASSUDULLAH Q.[1],               :       NO. 3:22-CV-1061 (RMS)
*Plaintiff,*             :
                                :

V.                             :
                                :

KILOLO KIJAKAZI, ACTING     :
COMMISSIONER OF THE SOCIAL   :
SECURITY ADMIN.,         :
*Defendant.*           :
                                :       DATE: SEPTEMBER 1, 2023
                                :
------------------------------------------------------- x

## RULING ON THE PLAINTIFF'S MOTION TO REVERSE THE DECISION OF THE COMMISSIONER, OR, IN THE ALTERNATIVE, FOR REMAND FOR A HEARING, AND ON THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

Before the Court is an administrative appeal filed by Assudulluh Q. ("the plaintiff") pursuant to 42 U.S.C. § 405(g), following the denial of his application for disability insurance benefits ("DIB"), alleging disability beginning August 1, 2018.[2]  The plaintiff moves for an order reversing the decision of the Commissioner of the Social Security Administration ("Commissioner"), or, in the alternative, remanding the case for a new hearing before an

---

[1]  To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2]  Under the Social Security Act ("the Act"), the "Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under [the Act]." 42 U.S.C. §§ 405(b)(1), 1883(c)(1)(A). The Commissioner's authority to make such findings and decisions is delegated to an administrative law judge ("ALJ"). *See* 20 C.F.R. §§ 404.929, 416.1429. The plaintiffs can appeal an ALJ's decision to the Social Security Appeals Council. *See* 20 C.F.R. §§ 404.967, 416.1467. If the Appeals Council declines review or affirms the ALJ's decision, then the claimant may appeal to the United States district court. Section 205(g) of the Act provides that "[t]he court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

Administrative Law Judge ("ALJ").  In particular, the plaintiff argues that ALJ Louis Bonsangue erred by: (1) improperly evaluating the medical evidence in his determination of the plaintiff's residual functional capacity ("RFC"), and otherwise failing to adequately develop the record; and (2) failing to satisfy his burden of proof at Step Five of the sequential evaluation process, by relying on unsupported testimony from vocational expert ("VE") Hank Lerner.  (Doc. Nos. 18, 19 at 2). The Commissioner moves to affirm the decision below, arguing that substantial evidence supports the ALJ's finding that the plaintiff could do a range of medium, simple work despite his impairments, and that the ALJ reasonably relied on the VE's testimony to find that the plaintiff could perform other work existing in significant numbers in the national economy.  (*See* Doc. No. 20-1).

For the reasons set forth below, the plaintiff's Motion for Order Reversing the Decision of the Commissioner (Doc. No. 18) is **DENIED**, and the Commissioner's Motion for an Order Affirming the Commissioner's Decision (Doc. No. 20) is **GRANTED**.

## I.    PROCEDURAL HISTORY

The plaintiff submitted a Medical Chronology (Doc. No. 18-1), which the Commissioner adopts and supplements with additional information.  (Doc. No. 20-2).  The Court has reviewed the parties' submissions and incorporates them into this ruling.

The plaintiff alleges that his disability began on August 1, 2018.  (Doc. No. 19 at 2; Certified Transcript of Administrative Proceedings, dated September 29, 2021 ("Tr.") at 15).  On July 18, 2019, the plaintiff filed an application for DIB.  (Tr. 15).  The Commissioner denied the plaintiff's application initially on November 27, 2019, and upon reconsideration on June 15, 2020. (*Id.*).  The Commissioner received the plaintiff's request for a hearing on July 29, 2020, and on June 23, 2021, the plaintiff, his attorney, and VE Lerner appeared for a telephonic hearing before

ALJ Bonsangue.[3]  (*Id.* (citing 20 CFR §§ 404.929, *et seq.*)).  On September 29, 2021, the ALJ issued an unfavorable decision, denying the plaintiff's request for benefits.  (Tr. 15–32).  On June 28, 2022, the Appeals Council denied the plaintiff's request for review, thereby rendering the ALJ's decision final.  (Doc. No. 19 at 1).

On August 23, 2022, the plaintiff filed this action seeking judicial review of the Commissioner's decision.  (Doc. No. 1).  Upon consent of both parties, this case was transferred to the undersigned on October 6, 2022 (*see* Doc. No. 14), and on October 21, 2022, the Commissioner filed the certified administrative record ("CAR").  (Doc. No. 16).  On December 19, 2022, the plaintiff timely filed his Motion for Order Reversing the Decision of the Commissioner (Doc. No. 18), together with a Medical Chronology (Doc. No. 18-1), as well as an appendix (Doc. No. 18-2).  On December 21, 2022, the plaintiff filed a memorandum in support of his motion.  (Doc. No. 19).  On January 31, 2023, the Commissioner filed its Motion for an Order Affirming the Commissioner's Decision, together with a supporting memorandum and a Statement of Facts.  (Doc. Nos. 20, 20-1, 20-2).

## II.    FACTUAL BACKGROUND

### A.    The Plaintiff's Hearing Testimony

The plaintiff has a Bachelor of Architecture, a five-year degree, from Harvard University. (Tr. 55).  The plaintiff has a valid driver's license and is able to drive.  (Tr. 55–56).

In 2006, the plaintiff was employed as an architect at Peter Talbot Architects.  (Tr. 56).  He worked on a computer to draft, design, and detail projects.  (*Id.*).  Occasionally, he had to be on-site at his projects to monitor progress, but this did not require that he do anything physical.  (Tr. 56–57).

---

[3]  The hearing was conducted telephonically due to the extraordinary circumstance presented by the COVID-19 pandemic.  (Tr. 15).

Thereafter, the plaintiff worked at another architectural firm, Fletcher Thompson, where he had similar job duties. (Tr. 57).

From 2012 until 2015, the plaintiff was employed part-time as an appliance salesperson at Sears. (*Id.*). He would typically work four or five hours per shift, most of which he spent on his feet. (*Id.*). Although the plaintiff was selling large appliances, he never had to lift anything while working at Sears. (Tr. 58).

The plaintiff returned to Fletcher Thompson as an architect in 2015. (*Id.*). In 2018, he began working as an architect at Rogers McCagg Architects, which did not require him to engage in any physical activity. (*Id.*). The plaintiff was eventually terminated from Rogers McCagg Architects, due to his inability to focus and his lack of interest in the job. (Tr. 63–64). That same year, the plaintiff also worked at another architecture firm, Securitech Solutions, but was also terminated there, due to an inability to focus. (Tr. 59, 63). The plaintiff has not worked since August 2018. (Tr. 58–59).

Although the plaintiff struggled with his hearing for fifteen years prior, he had only begun to wear hearing aids in 2020, once Medicaid paid for them. (Tr. 60). The plaintiff's hearing is worse on his left side than on the right. (*Id.*). With his hearing aids, the plaintiff can hold a conversation with another person if no one else is present; however, he cannot concentrate when there is more than one person talking at once. (Tr. 61).

The plaintiff experienced pain in his neck for approximately 20 years prior to the hearing. (Tr. 62). The pain had gotten so bad that he was unable to move his head while driving. (*Id.*). He last received physical therapy at StayWell and Access Rehab Center ("StayWell"), one year prior to the hearing. (Tr. 72). Before that, he had been receiving physical therapy on a daily basis for many years. (*Id.*). However, despite receiving treatment, the plaintiff experienced chronic pain in

his right shoulder and on the right side of his neck, which prevented him from lifting more than five or ten pounds. (Tr. 72–73). The plaintiff's wife and children handled all of the household chores. (Tr. 73).

The plaintiff sought treatment for depression twice per week since 2015, from Dr. Stern and a therapist/counselor at StayWell. (Tr. 64). Although he was prescribed medication, it was ineffective. (Tr. 65). Around the time of the hearing, the plaintiff regularly experienced a loss of interest in doing work. (Tr. 65–66). Instead, he wanted to sleep and be left alone. (Tr. 66). He visited StayWell every six weeks for medication management and complied with the medication regimen he was prescribed. (Tr. 67).

Four-to-five times per week, the plaintiff experienced nightmares stemming from the trauma he experienced while living in Kabul, Afghanistan during wartime, prior to coming to the United States in 1984. (Tr. 68–69). He became agitated easily and struggled to get along with others. (Tr. 69).

The onset of the plaintiff's heart problems began with a painful pinching sensation in his heart.[4] (Tr. 70). A doctor inserted a stent in his heart, which caused him to feel short of breath. (*Id.*). As a result, the plaintiff was unable to walk for long or do any heavy lifting, would get tired shopping for groceries, and experienced shortness of breath during attempts to exercise. (Tr. 70–71). Every six months, he visited a heart specialist who prescribed him medication. (Tr. 71).

### B.   The Vocational Expert's Hearing Testimony

VE Lerner also testified at the plaintiff's hearing. He began by summarizing the plaintiff's past work as an architect, which is listed in the Dictionary of Occupational Titles ("DOT") as a skilled job requiring light exertion. (Tr. 76). However, based on the plaintiff's description of his

---

[4] At his hearing, the plaintiff did not testify as to the date upon which these symptoms began. However, the medical evidence in the record indicates that the plaintiff reported experiencing chest pain on October 23, 2019. (*See* Tr. 473).

work as an architect, VE Lerner concluded that the plaintiff was performing the job at a sedentary level of exertion.  (*Id.*).  Moreover, VE Lerner explained that the plaintiff's work as a salesperson at Sears is defined in the DOT as a semi-skilled job requiring light exertion.  (*Id.*).

The ALJ presented VE Lerner with a hypothetical scenario involving an individual with the claimant's age, education, and past work, who is limited to the medium exertion level and to only occasionally climbing ramps or stairs; never climbing ropes, ladders, or scaffolds; and occasional crawling and overhead reaching bilaterally.  (Tr. 77–78).  The hypothetical individual could not be exposed to loud noise, vibration, moving parts, or unprotected heights.  (Tr. 78).  Additionally, he could understand and remember only simple instructions, perform only simple tasks, and tolerate only simple and basic changes in his work routine on a day-to-day basis.  (*Id.*).  VE Lerner testified that an individual with these limitations would be unable to perform any of his past work since it was all skilled or semi-skilled.  (*Id.*).  Nevertheless, the hypothetical individual with these limitations could perform unskilled work at a medium exertion level.  (*Id.*).  Specifically, he could perform the work of a Hand Packager, an unskilled position requiring medium exertion, of which there are 91,000 full-time positions in the national economy. (Tr. 78–79).  Additionally, the hypothetical individual could perform the work of a Machine Packager, requiring medium exertion and totaling 31,000 full-time positions in the national economy, as well as a Food Service Worker (Hospital), requiring medium exertion and totaling 65,000 full-time positions in the national economy.  (Tr. 79).

VE Lerner further testified that, for these hypothetical scenarios, he could not rely entirely upon the DOT since it does not address occasional *overhead* reaching, which was a limitation included in the ALJ's hypothetical.  (*Id.*).  Instead, VE Lerner based his conclusion in part upon his 40 years of job placement and employer sampling experience.  (*Id.*).  As such, the ALJ

confirmed that VE Lerner's testimony regarding exertional and postural limitations was otherwise consistent with the DOT.  (*Id.*).  VE Lerner testified that the Hand Packager position involves constant reaching outwards and lifting below the shoulder, and that the Machine Packager and Food Service Worker positions require frequent overhead reaching.  (Tr. 81).

Next, the ALJ presented a hypothetical involving all of the same limitations, as well as the limitation of occasional reaching with the right upper extremity.  (Tr. 81–82).  Relying upon his extensive rehabilitation placement experience, VE Lerner opined that an individual with these limitations would be limited to jobs requiring only light exertion.  (Tr. 82).

### C.    Objective Medical Evidence

#### 1.    Physical Impairments

Audiometry testing by Marissa L. Stankus, PA-C on September 12, 2018 showed mild to moderate sensorineural hearing loss in the plaintiff's right ear, as well as severe to profound mixed hearing loss in the left ear.  (Tr. 433–34).  PA Stankus recommended a hearing aid consultation.  (*Id.*).  On November 9, 2018, audiologist Allison Phipps, AuD, CCC-A indicated in a letter to the plaintiff's primary care physician, Zife Krosi, M.D., that the plaintiff completed a trial with his hearing aids, and that he was benefitting from them and using them regularly.  (Tr. 420).  Dr. Phipps recommended that the plaintiff follow up with an audiological evaluation and amplification check in one year.  (*Id.*).

In his notes from the plaintiff's visit on October 11, 2018, cardiologist Raghuraman Vidhun, M.D., noted that the plaintiff complained of intermittent headaches and presented with blood pressure that was periodically elevated.  (Tr. 490).  The plaintiff denied chest pain and shortness of breath, however.  (*Id.*).  Nevertheless, due to the plaintiff's abnormal electrocardiogram and finding of hypertension with borderline elevated blood pressure, Dr.

Vidhun prescribed medication.  (Tr. 491).  Just over one year later, on October 23, 2019, the plaintiff reported to cardiologist Essam N. Nakhla, M.D. that, for the prior 48 hours, he had been experiencing brief, intermittent episodes of sharp left precordial chest pain while at rest, as well as worsening fatigue.  (Tr. 473).  The plaintiff further described the pain as mild in severity, and denied shortness of breath, either with exertion or at rest.  (*Id.*).  A resulting chest x-ray was "unremarkable."  (Tr. 476).  Moreover, arrhythmia monitoring conducted on November 7, 2019 by Dr. Stephen Widman, M.D. was benign, with minimal supraventricular and ventricular ectopy. (Tr. 496).

On November 13, 2019, the plaintiff again complained to Dr. Vidhun of intermittent chest pain radiating to his back, as well as shortness of breath at rest, worsening with exertion.  (Tr. 487). Consequently, on November 19, 2019, Dr. Vidhun performed a cardiac catheterization and angioplasty, and inserted a stent upon observing 70 percent stenosis in the plaintiff's left anterior descending artery and normal systolic function in his left ventricle.  (Tr. 471–72).  On December 9, 2019, the plaintiff reported that he generally felt well, with no shortness of breath, functional impairments, or other symptoms.  (Tr. 484).  However, the plaintiff did report feeling a pinching pain after the stenting.  (*Id.*).  On January 9, 2020, the plaintiff reported to Zife Krosi, M.D., —his primary care physician—that he felt well after the stent, and had no chest pain or discomfort, and no palpitations.  (Tr. 534).  On September 18, 2020, Dr. Vidhun noted that the plaintiff reported no chest discomfort with daily activities and that he had not needed to use Nitroglycerin.  (Tr. 656).  The plaintiff also reported no chest, neck, or left arm pain with exertion, no dyspnea with exertion, no back pain, and no sweating or nausea.  (Tr. 657).  Moreover, Dr. Vidhun noted that the plaintiff's hypertension was controlled with medication, and further recommended that the plaintiff continue taking medication for coronary artery disease.  (Tr. 658).  Finally, on April 8,

2021, Dr. Vidhun noted that the plaintiff reported that he sometimes felt very weak and tired, but did not have any chest, neck, or arm pain, palpitations, or orthopnea.  (Tr. 725).  The plaintiff did complain of shortness of breath with exertion, and noted that he became fatigued easily.  (*Id.*).  Dr. Vidhun noted that the plaintiff's hypertension continued to be controlled with medication, and modified the plaintiff's medication for coronary artery disease.  (Tr. 726).

On July 3, 2018, the plaintiff's primary care physician, Dr. Krosi, diagnosed the plaintiff with cervicalgia, or neck pain, and, upon request, referred the plaintiff for physical therapy.  (Tr. 374, 412 (describing the plaintiff's history of neck pain)).  Thereafter, on October 24, 2018, the plaintiff stated to Dr. Krosi that he had experienced neck and upper back pain for a while and had been undergoing physical therapy for one year without improvement.  (Tr. 385).  On examination, Dr. Krosi observed that the plaintiff had very tight upper back muscles and "traps," particularly on the right side.  (Tr. 388).  Notes from the plaintiff's treatment with Dr. Krosi on December 5, 2018 similarly indicate that the plaintiff again presented with very tight upper back muscles and traps on the right side.  (Tr. 384).  The plaintiff reported no improvement to his back pain and stated that he would try chiropractic care.  (Tr. 382).  Upon assessment for depression, the plaintiff did not display any symptoms.  (Tr. 384)).

Thereafter, Dr. Krosi left the practice and was replaced by Miguel Mantilla, M.D., as the plaintiff's primary care physician.  (Tr. 784).  Dr. Mantilla first had contact with the plaintiff on June 25, 2021, and, within a mental RFC questionnaire dated September 13, 2021, stated that the plaintiff had chronic right shoulder pain due to tendonitis/arthritis.[5]  (Tr. 785, 791).

---

[5] This notation was provided by Dr. Mantilla in response to item #17 within the mental RFC questionnaire, which asked for a description of "any additional reasons, not covered above, why [the plaintiff] would have difficult working a regular job on a sustained basis."  (Tr. 791).

On July 10, 2019, at an initial evaluation by Mauna Jacobi, PT, the plaintiff described a chronic, unimproved history of neck pain (*i.e.*, cervicalgia) lasting 30 years.  (Tr. 412). Approximately one year later, on July 16, 2020, the plaintiff attended another initial evaluation, this time conducted by Kristen Dabbo, DPT.  (*See* Tr. 701).  There, the plaintiff again reported a chronic history of neck and right shoulder pain, and noted that he had received physical therapy in the past, with good relief.  (*Id.*).  On August 11, 2020, the plaintiff reported to Alyssa Boudreau, PT that he was feeling good, and that physical therapy was helping his cervicalgia, despite still experiencing mild soreness in his neck and shoulder region.  (Tr. 696).  Treatment notes from August 11, 2020 further reflect that the plaintiff was "now able to perform overhead tasks with light objects," and "carry light weights."  (Tr. 697).

Physical therapy records from September 23, 2020 indicate that the plaintiff had attended seventeen sessions to treat his cervicalgia and pain in his right shoulder.  (Tr. 682).  The plaintiff reported that he felt better but that he continued to experience occasional bouts of intense pain. (*Id.*). More specifically, the plaintiff reported that he was progressing well with improved cervical range of motion compared to his initial evaluation, but nevertheless still had difficulty with reaching overhead for household chores and with any moderate to heavy lifting/carrying.  (Tr. 683).

The plaintiff underwent multiple x-rays of his cervical spine and chest between October 25, 2018 and December 26, 2019.  (Tr. 418, 423, 501, 592).  The results of these x-rays were unremarkable and showed no signs of disease.  (*Id.*).

Regarding the plaintiff's obesity, he presented with a body mass index ("BMI") of 30.72 on November 1, 2018, and a BMI of 30.4 on March 6, 2020.  (Tr. 421, 575).

###### 2.    Mental Impairments

Plaintiff initially sought treatment for his mental impairments in 2015.  (Tr. 745–46).  At intake, the plaintiff reported that: (a) he had been exposed to war during his developing years in Afghanistan; (2) he had lost his job a few years earlier because he could not concentrate and was always tired; (3) he struggled to concentrate as a child, and was generally distractible, compulsive, and at times overly talkative; and (4) he had multiple interfering thoughts.  (*Id.*).  He further stated that he was short-tempered, hyperactive, impulsive, and aggressive, and that he had concrete learning problems as a child.  (Tr. 746).  Finally, the plaintiff noted that he tended to feel depressed and tired, and that he worried, which caused him to eat more and gain weight.  (*Id.*).

The plaintiff sought therapy and medication management for the aforementioned issues from July 19, 2019 through April 27, 2021.  (*See* Tr. 526–72, 618–52, 666–721, 731–63).  In therapy, the plaintiff worked on managing his mood and anxiety, and addressed his struggles with low self-esteem and treatment compliance.  (Tr. 562).  The plaintiff was diagnosed with major depressive disorder and ADHD.  (Tr. 561).

A treatment plan review[6] from StayWell dated September 7, 2019 indicates that initial treatment for the plaintiff's mental impairments was not particularly effective, as the plaintiff experienced issues with treatment compliance, and reported little change in mood, anxiety, and self-esteem.  (Tr. 560).  However, a StayWell transfer note reflecting the plaintiff's transfer from Susan Murray, MA to Victoria Pappas, APRN on November 5, 2019 indicates that the plaintiff had maximized the benefit of weekly, individual therapy, was functioning well, and demonstrated

---

[6] The medical evidence in the CAR from StayWell Health Center regularly takes the form of "treatment plan review[s]."  StayWell's treatment plan reviews provide an overview of the plaintiff's behavior health progress typically within a preceding 90-day period.  (*See, e.g.*, Tr. 542, 560, 669–75, 705–07).

stable mood and use of coping skills. (Tr. 549–550). The transfer note further indicated that the plaintiff was functioning at a normal level and looking to return to work. (*Id.*).

Approximately one month later, a treatment plan review from APRN Pappas noted that the plaintiff had shown good progress over the preceding 90 days. (Tr. 542). The review from APRN Pappas further noted that the plaintiff continued to maintain his therapeutic gains, denied depressed mood and sadness, was less distracted, was able to stay on task, was finishing projects, and was less impulsive. (*Id.*). Likewise, the plaintiff's March 3, 2020 treatment plan review again indicated good progress, including the plaintiff's continued denial of depressed mood and sadness, anxiety, and restlessness. (Tr. 533). However, the March 3, 2020 review also stated that the plaintiff had not been engaging in activities around the house and completing projects, and that he had experienced occasional intrusive thoughts about the past. (*Id.*).

On June 8, 2020, APRN Pappas noted that, while the plaintiff had regained stability in the preceding three weeks, he had generally struggled to maintain gains since the last review. (Tr. 635). During this time, the plaintiff experienced a major depressive episode lasting three weeks, characterized by low mood, anhedonia, amotivation, fatigue, hypersomnia, increased irritability, and anxiety. (Tr. 630–31). Nevertheless, subsequent treatment plan reviews/notes from StayWell dated August 12, 2020, November 12, 2020, and December 22, 2020 indicate that, for the remainder of 2020, the plaintiff maintained his therapeutic gains and was able to control his depression, irritability, and anxiety, and that he denied any concerns with attention/concentration. (Tr. 669–75, 705–07). During this time, the plaintiff was also able to sleep well, maintain a stable diet, and remain "future-oriented," and did not experience flashbacks of past trauma (*Id.*).

Notes from a telehealth session on February 4, 2021 similarly reflect that, but for an occasional down day, the plaintiff continued to maintain his therapeutic gains and control his

depression and irritability. (Tr. 711–12). However, as of April 27, 2021, the plaintiff had started to again experience an increase in depression and trauma symptoms, as well as difficulty completing his daily activities and maintaining focus. (Tr. 734–35).

     **D.**     **Medical Opinion Evidence**

The ALJ considered the medical opinions of state agency reviewers Rafael S. Wurzel, M.D. and Ricardo Ramirez, M.D., as well as the plaintiff's primary care physician, Miguel Mantilla, M.D., in connection with an assessment of the plaintiff's physical residual functional capacity ("PRFC"). (*See* Tr. 28). The ALJ also considered the medical opinions of primary care physicians Leonard Stern, M.D. and Miguel Mantilla, M.D., as well as state agency reviewers Janine Swanson, PsyD and Russell Phillips, M.D., in connection with an assessment of the plaintiff's mental residual functional capacity ("MRFC"). (Tr. 29–30).

     **1.**     **Physical Impairments**

As to the plaintiff's physical impairments, the ALJ first considered the November 2019 PRFC assessment of state agency reviewer Rafael S. Wurtzel, M.D., and found it to be generally persuasive. (Tr. 28, (citing Tr. 93–95)). Dr. Wurtzel opined that the plaintiff had the capacity to perform work at the medium exertional level, including overhead reaching bilaterally. (*Id.* (citing Tr. 93–94)). Dr. Wurtzel further opined that the plaintiff was not limited regarding ramps or stairs, and that the plaintiff could occasionally crawl and climb ladders, ropes, or scaffolds. (*Id.*). Dr. Wurtzel noted that the plaintiff should avoid concentrated exposure to noise, vibration, and hazards such as machinery and heights. (*Id.* (citing Tr. 94–95)). Dr. Wurtzel's opinions were based upon a review of the record through November 2019. (*Id.*). The ALJ concluded that, although Dr. Wurtzel did not have access to any records after November 2019, his opinions were "generally consistent with the conservative course of treatment regarding physical impairments." (*Id.*).

The ALJ also considered the June 2020 PRFC assessment of state agency reviewer Ricardo Ramirez, M.D., and found it generally persuasive.  (*Id.* (citing Tr. 106–08)).  Dr. Ramirez opined that the plaintiff had the capacity to perform work at the medium exertional level, including occasional bilateral overhead reaching.  (*Id.* (citing Tr. 107)).  Dr. Ramirez further opined that the plaintiff was not limited regarding ramps or stairs, and that the plaintiff could occasionally crawl and climb ladders, ropes, or scaffolds.  (*Id.* (citing Tr. 106)).  Dr. Ramirez noted that the plaintiff should avoid concentrated exposure to noise, vibration, and hazards such as a machinery and heights.  (*Id.* (citing Tr. 107)).  Dr. Ramirez's opinions were based upon a review of the record through June 2020.  (Tr. 28).  The ALJ concluded that, although Dr. Ramirez did not have access to any records after June 2020, his opinions are "generally consistent with the conservative course of treatment regarding physical impairments."  (*Id.*).

Lastly, the ALJ considered the June 25, 2021 PRFC assessment of primary care physician Miguel Mantilla, M.D., and found it unpersuasive.  Dr. Mantilla opined that the plaintiff could not lift over ten pounds and could not push or pull over twenty pounds, or climb or reach overhead.  (Tr. 29 (citing Tr. 765)).  Dr. Mantilla stated that the aforementioned restrictions "should last at least two to three weeks for now."  (*Id.*).  The ALJ concluded that Dr. Mantilla's opinion was entirely inconsistent with the record, which did not reflect imaging showing any musculoskeletal impairment.  (*Id.*).  The ALJ further noted that Dr. Mantilla's opinion was not supported with any treatment records, contemporaneous or otherwise, as it appears that Dr. Mantilla did not have any contact with the plaintiff prior to the date of the PRFC assessment.  (*Id.*).

To account for the plaintiff's limitations stemming from his musculoskeletal impairments as exacerbated by obesity, the ALJ limited the plaintiff to the reduced range of medium work with further limitation regarding overhead reaching.  (Tr. 30–31).  Moreover, to account for the

plaintiff's need to avoid heavy exertion due to his cardiac impairments as exacerbated by obesity, the ALJ restricted the plaintiff from heavy exertion.  (Tr. 31).

### 2.    Mental Impairments

Regarding the plaintiff's mental impairments, the ALJ considered the July 2019 MRFC assessment completed by primary care physician Leonard Stern, M.D., and found it to be somewhat persuasive.   (Tr. 29).   Dr. Stern opined that, while the plaintiff had average ability/functioning in caring for personal hygiene, caring for physical needs such as dressing and eating, and using good judgment regarding safety and dangerous circumstances, he did sometimes have a problem in using appropriate coping skills and handling frustration appropriately.  (*Id.*). Dr. Stern further opined that the plaintiff had average ability/functioning in carrying out single-step instructions, but noted reduced ability in carrying out multi-step instructions, changing from one simple task to another, performing basic activities at a reasonable pace, and persisting in simple activities without interruption from psychological symptoms.  (*Id.*).  Dr. Stern also noted the plaintiff's limited ability to ask questions or request assistance, and to focus long enough to finish simple activities or tasks.  (*Id.*).  The ALJ concluded that, while Dr. Stern's opinion was generally consistent with the record, his opinions regarding the plaintiff's trouble asking questions or requesting assistance, as well as the plaintiff's difficulty persisting in simple activities and focusing, were not consistent with the record, which reflected consistent cooperation by the plaintiff and symptomatology generally controlled with medication and psychotherapy. (*Id.*).  The ALJ also noted that while this opinion was supported by a November 2019 transfer note signed by Dr. Stern, it was not supported by any contemporaneous treatment notes from Dr. Stern himself. (*Id.*).

The ALJ also considered the September 2019 MRFC assessment completed by state agency reviewer Dr. Janine Swanson, PsyD, finding it to be somewhat persuasive. (Tr. 30). Dr. Swanson opined that the plaintiff had a moderate limitation in concentrating, persisting, or maintaining pace, but otherwise had only mild limitation in the remaining areas of function. (*Id.* (citing Tr. 91)). Dr. Swanson further opined that, while the plaintiff could understand and remember simple and detailed instructions and could maintain concentration and attention over extended periods for simple tasks, he could not consistently maintain concentration, persistence, or pace for detailed or complex tasks. (Tr. 30). The ALJ concluded that Dr. Swanson's opinion was generally consistent with the record, but nevertheless found that the plaintiff had a more significant limitation regarding his ability to adapt (*i.e.*, "moderate" as opposed to "mild"). (*Id.*; *see also* Tr. 20). The ALJ also noted that Dr. Swanson's opinion was only supported by a review of the record through September 2019. (Tr. 30).

Next, the ALJ considered the June 2020 MRFC assessment completed by state agency reviewer Dr. Russell Phillips, finding it to be somewhat persuasive. (*Id.*). Dr. Phillips opined that the plaintiff had a moderate limitation in concentrating, persisting, or maintaining pace, but otherwise had only mild limitation in the remaining areas of function. (*Id.*). Dr. Phillips further opined that the plaintiff exhibited moderate limitations in responding appropriately to changes in work setting, performing activities within a schedule, maintaining regular attendance, being punctual, and completing a normal workday or workweek without interruption from psychiatric symptoms, as well as performing at a consistent pace without an unreasonable number and length of rest periods. (*Id.*). Dr. Phillips further noted that the plaintiff was able to persist at simple tasks over time under ordinary conditions. (*Id.*). The ALJ concluded that, while Dr. Phillips' opinion was generally consistent with the record, the limitations regarding performance of activities within

a schedule, maintaining regular attendance and being punctual, as well as completing a normal workday or workweek without interruption from psychiatric symptoms and performing at a consistent pace without an unreasonable number and length of rest periods, were inconsistent with the evidence of record, which indicated that therapy and medication management controlled symptomatology throughout the period at issue, aside from two separate three-week periods of time around June 2020 and April 2021.[7]  The ALJ also noted that Dr. Phillips' opinion was only supported by a review of the record through June 2020.  (*See id.*).

Finally, the ALJ considered the September 2021 MRFC assessment completed by primary care physician Miguel Mantilla, M.D., finding it to be unpersuasive.  (Tr. 29–30).  Dr. Mantilla noted that the plaintiff was responding well to psychiatric medication, and further opined that the plaintiff had mild limitations in interacting with the public and asking simple questions and/or requesting assistance, and moderate limitations in remembering locations, understanding simple instructions, and completing a normal work week without interruptions from psychologically based symptoms.  (Tr. 788).  Dr. Mantilla also opined that the plaintiff had marked limitations in: (1) carrying out detailed instructions; (2) maintaining attention and concentration; (3) performing activities within a schedule; (4) sustaining an ordinary routine without special supervision; (5) working in coordination with others without distraction; and (6) making simple, work-related decisions.  (*See id.*).  Dr. Mantilla opined that the plaintiff would be absent from work about four days per month, and that he had marginal adjustment.  (Tr. 791).  The ALJ concluded that Dr. Mantilla's opinion was entirely inconsistent with the evidence of record, which indicated that psychotherapy and medication management generally alleviated the plaintiff's psychiatric

---

[7]  In his decision, the ALJ repeatedly refers to the first "three-week period" as occurring in June 2018.  (*See* Tr. 19, 20, 27, 30).  However, the plaintiff did not even begin psychotherapy treatment until 2019, and indeed, it appears that this "three-week period" actually occurred around June *2020*.  (*See* Tr. 25 (citing Tr. 635)).

symptomatology.  (Tr. 30).  The ALJ further noted that Dr. Mantilla's opinion was not supported

by any contemporaneous treatment records, and that in fact, Dr. Mantilla was a primary care

physician and not a psychiatrist or psychotherapist who treated the plaintiff specifically for

psychiatric impairments.  (Tr. 29–30).

### E.      The ALJ's Decision

On September 29, 2021, the ALJ made several findings in his decision that are subject to

review by this Court.  (*See* Tr. 17–32).

Following the five-step evaluation process,[8] the ALJ found that the plaintiff met the insured

status requirements through December 31, 2023, and that he had not engaged in substantial gainful

employment since August 1, 2018, the alleged onset date.  (Tr. 17 (citing 20 C.F.R. § 404.1571, *et

seq.*)).  The plaintiff testified that he stopped working on August 1, 2018, and the record reflects

no income after the third quarter of 2018.  (*Id.* (citing Tr. 242–60, 262)).

At Step Two, the ALJ found that the plaintiff had the following severe impairments: major

depressive disorder, post-traumatic stress disorder ("PTSD"), attention deficit hyperactivity

disorder ("ADHD"), bilateral hearing loss, coronary artery disease, status-post stenting,

---

[8] An ALJ determines a claimant's disability using a five-step analysis.  *See* 20 C.F.R. § 404.1520.  First, an ALJ must
determine whether a claimant is currently working.  *See* 20 C.F.R. § 404.1520(a)(4)(i).  If a claimant is currently
employed, then the claim is denied.  *Id.*  If a claimant is not working, however, then an ALJ must make a finding as
to the existence of a severe mental or physical impairment.  If none exists, then the claim is denied.  *See* 20 C.F.R. §
404.1520(a)(4)(ii).  If a claimant is found to have a severe impairment, however, then an ALJ must compare the
claimant's impairment with those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the
Listings").  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142
F.3d 75, 79–80 (2d Cir. 1998).  If a claimant's impairment meets or equals one of the impairments in the Listings,
then the claimant is automatically considered disabled.  *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142
F.3d at 80.  If a claimant's impairment does not meet or equal one of the listed impairments, however, then the claimant
must show that he cannot perform his former work.  *See* 20 C.F.R. § 404.1520(a)(4)(iv).  If a claimant shows that he
cannot perform her former work, then the burden shifts to the Commissioner to show that the claimant can perform
other gainful work.  *See Balsamo*, 142 F.3d at 80 (citations omitted).  A claimant is entitled to receive disability
benefits only if he shows that he cannot perform his former work and the Commissioner fails to show that the claimant
can perform alternate gainful employment.  *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80
(citations omitted).

hypertension, tendinitis/arthritis in the shoulder and cervical spine, and obesity.  (Tr. 18 (citing 20 C.F.R. § 404.1520(c))).

The ALJ concluded at Step Three that the plaintiff did not have any physical or mental impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subp't P, App'x 1.  (Tr. 18 (citing 20 C.F.R. §§ 404.1520(c), 404.1525–26)).  As to the plaintiff's physical impairments, the ALJ found that: (a) the plaintiff's coronary artery disease did not meet Listing 4.04, because the plaintiff had neither "established the requisite diagnostic test results," nor established the requisite "three separate ischemic episodes . . . within a consecutive 12-month period"; (b) the plaintiff's hearing loss did not meet Listing 2.10 because the plaintiff had not established the requisite average air and/or bone conduction hearing thresholds, or otherwise established a word recognition score of 40% or less; (c) the plaintiff's cervical spine impairment did not meet Listing 1.15, because, *inter alia*, he had not "established findings on imaging consistent with compromise of a nerve root or compromise of the cauda equina with lumbar spinal stenosis"; and (d) the plaintiff's shoulder impairment did not meet Listing 1.18, because the plaintiff had not established a documented medical need for an assistive mobility device, or otherwise established "inability to use any upper extremity as defined in the listing."  (Tr. 18).  The ALJ further emphasized that he "considered the exacerbating effects of obesity on the claimant's symptoms in accordance with SSR 19-2p."  (Tr. 19).

As to the plaintiff's mental impairments, the ALJ determined that they did not meet Listings 12.04, 12.11, or 12.15.  (Tr. 19).  More specifically, the ALJ concluded that the plaintiff's mental impairments did not satisfy the "paragraph B" criteria because they did not cause either at least two "marked" limitations, or one "extreme" limitation.  (Tr. 20).  Similarly, the ALJ further

found that the evidence in the record failed to establish the requisite "paragraph C" criteria. (*Id.*; *see* 20 C.F.R. Part 404, Subp't P, App'x 1 at 12.00)).

Having concluded that the plaintiff's physical and mental impairments did not meet any Listing, the ALJ determined that the plaintiff had the RFC to perform medium work, as defined in 20 C.F.R. § 404.1567(c), except that he could occasionally climb ramps and stairs but never ladders, ropes, or scaffolds; occasionally crawl and reach overhead with his bilateral upper extremities; never have concentrated exposure to loud noise, vibrations, moving parts, or unprotected heights; understand and remember simple instructions, perform simple tasks, and tolerate simple and basic changes to the daily work routine. (Tr. 20).

At Step Four, the ALJ found that the plaintiff had past relevant work that VE Lerner identified as that of a salesperson of household appliances (a semi-skilled position), and an architect (a skilled position). (*Id.*). Because the ALJ limited the plaintiff to unskilled work, he found that the demands of the plaintiff's past relevant work exceeded his RFC. (*Id.*). Additionally, VE Lerner testified that an individual with the plaintiff's RFC could not perform the plaintiff's past relevant work. (*Id.*). Accordingly, the ALJ concluded that the plaintiff was unable to perform any past relevant work as actually or generally performed. (*Id.* (citing 20 C.F.R. § 404.1565)).

Finally, at Step Five, the ALJ considered VE Lerner's testimony in conjunction with the plaintiff's age, education, work experience, and RFC, and concluded that the plaintiff could make a successful adjustment to other work that existed in significant numbers in the national economy. (Tr. 32). More specifically, the ALJ relied on VE Lerner's testimony that the plaintiff could perform the following three jobs existing in significant numbers in the national economy: (1) Hand Packager (DOT 920.587-018; medium level of exertion; unskilled; 91,000 jobs in the national economy); (2) Machine Packager (DOT 920.685-078; medium level of exertion; unskilled; 31,000

jobs); and (3) Food Service Worker – Hospital (DOT 319.677-014; medium level of exertion; unskilled; 65,000 jobs).  (*See id.*).  The ALJ further found that VE Lerner's testimony was consistent with the DOT, and acknowledged that VE Lerner addressed the DOT's silence as to overhead reaching by relying on his own professional experience.  (*Id.*).  Accordingly, the ALJ concluded that the plaintiff had not been under a disability at any time between August 1, 2018 and September 29, 2021, the date of the ALJ's decision.  (*Id.* (citing 20 C.F.R. § 404.1520(g))).

## III.    STANDARD OF REVIEW

Disabled individuals are entitled to receive benefits under the Social Security Act. *See* 42 U.S.C. §§ 423(a)(1), 1381a.  To be considered disabled and therefore entitled to DIB and SSI, a claimant must demonstrate that he is unable to work "by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or is expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). Such impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 416.920(c) (requiring that an impairment or combination thereof "significantly limit[] . . . physical or mental ability to do basic work activities" to be considered "severe").

When an ALJ determines that a claimant is not disabled and the Commissioner upholds the ALJ's decision, the claimant may seek judicial review by a district court.  *See* 42 U.S.C. § 405(g). In this capacity, the district court performs "an appellate function."  *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981).  When reviewing a denial of benefits, a district court may not make a *de novo* disability determination.  *Wagner v. Sec'y of Health & Human Serv's*, 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the court's function is to ascertain whether the ALJ applied the correct legal principles in reaching his conclusion, and whether his decision is supported by substantial

evidence. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) ("On judicial review, an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'") (quoting 42 U.S.C. § 405(g)).  Absent legal error, the district court may not set aside an ALJ's decision if it is supported by substantial evidence. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  Stated otherwise, if an ALJ's decision is supported by substantial evidence, then that decision will be sustained, even where there may also be substantial evidence to support a claimant's contrary position. *Id.*

"Substantial evidence" is evidence that a reasonable mind would accept as adequate to support a conclusion; it is more than a "mere scintilla." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation omitted); *Biestek*, 139 S. Ct. at 1154 ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high.").  The substantial evidence standard is "a very deferential standard of review—even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (citations omitted).  "[A district court] must 'consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Petrie v. Astrue*, 412 F. App'x 401, 403–04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)).

## IV.  DISCUSSION

The plaintiff claims that the ALJ erred in two respects.  (*See* Doc. No. 19 at 2).  More specifically, the plaintiff asserts that the ALJ: (1) improperly evaluated the medical evidence in his determination of the plaintiff's RFC, and otherwise failed to adequately develop the record; and (2) failed to satisfy his burden of proof at Step Five of the sequential evaluation process by relying on unsupported testimony from VE Lerner.  (*Id.*).

The Commissioner disputes the plaintiff's arguments, asserting instead that: (1) substantial evidence supports the ALJ's formulation of the plaintiff's RFC; and (2) the ALJ reasonably relied upon VE Lerner's testimony in finding that the plaintiff could do other work existing in significant numbers in the national economy.  (*See* Doc. No. 20-1 at 3–19).

For the reasons that follow, the Court finds that: (1) substantial evidence supports the ALJ's evaluation of the plaintiff's exertional and non-exertional limitations, and in turn, his RFC; (2) no further development of the record as to the plaintiff's purported non-exertional limitations was necessary; and (3) the ALJ was entitled to rely on VE Lerner's testimony in assessing the plaintiff's capacity to perform other work existing in significant numbers in the national economy. Accordingly, the plaintiff's motion for an order reversing or remanding the Commissioner's decision is **DENIED**; and the Commissioner's motion to affirm that decision is **GRANTED**.

## A.  The ALJ's RFC Formulation Is Supported By Substantial Evidence

As an initial matter, the plaintiff contends that the ALJ erred in determining his RFC, because: (a) the plaintiff "cannot perform the physical demands of medium exertional work . . . due to both cardiac and orthopedic factors"; and (b) the ALJ "made no limitations as to the plaintiff's inability to handle social demands and interactions." (*See* Doc. No. 19 at 8–10).  The Commissioner maintains, on the other hand, that "[t]he ALJ reasonably found that the plaintiff's coronary artery disease status post stenting did not preclude the performance of medium work"[9]; and that the plaintiff had no social limitations in his RFC and could mentally sustain full-time work.  (Doc. No. 20-1 at pp. 4, 8, 10).  As described below, the Court finds that substantial

---

[9] Medium work requires lifting of up to 50 pounds, frequently lifting or carrying up to 25 pounds, and standing or walking in combination for six hours out of an eight-hour workday.  (Tr. 20); *see* 20 C.F.R. § 404.1567(c); Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *6 (Jan. 1, 1983).

evidence, namely, objective medical records and credible medical opinions, supports the ALJ's formulation of the plaintiff's RFC.

As set forth above, the CAR is replete with objective medical evidence relating to the plaintiff's exertional and non-exertional limitations, as well as considerable medical opinion evidence. (*See* Tr. 21–31). The ALJ determined the plaintiff's RFC based upon the totality of the comprehensive evidence regarding the plaintiff's limitations. (*See id.*). To account for limitations stemming from the plaintiff's musculoskeletal impairments as exacerbated by obesity, the ALJ limited the plaintiff to the reduced range of medium work, with further limitation regarding overhead reaching. Moreover, to account for the plaintiff's need to avoid heavy exertion due to his cardiac impairments as exacerbated by obesity, the ALJ restricted him from heavy exertion. The ALJ also accounted for the plaintiff's mental impairments by limiting the plaintiff regarding simple tasks and simple changes in work routine.

### 1.    The Plaintiff's Exertional Limitations

Although the ALJ determined that the plaintiff was capable of performing medium exertion work, the plaintiff asserts that his cardiac issues, as well as his neck and shoulder pain, prevent him from performing the lifting demands of such work, and that accordingly, the ALJ erred by exaggerating the plaintiff's exertional abilities. (Doc. No. 19 at 8–9).[10] The Commissioner asserts that substantial evidence supports the ALJ's finding that the plaintiff was capable of working at

---

[10]   The plaintiff argues that he is disabled under "Grid Rule 202.06." (Doc. No. 19 at 9). In arriving at this conclusion, the plaintiff relies on his own determination that, contrary to the ALJ's finding that he is capable of work at the medium exertional level, he only has the capacity to perform light work. (*See id.*). But the Court does not agree. Indeed, there is substantial evidence to support the ALJ's finding that the plaintiff has the RFC to perform medium work. (*See* Tr. 20). "Although the grid results are generally dispositive, exclusive reliance on [them] is inappropriate where the guidelines fail to describe the full extent of a claimant's physical limitations." *Roma v. Astrue*, 468 F. App'x 16, 20 (2d Cir. 2012). Therefore, where, as here, a claimant's physical ability "falls between the ranges of work indicated in the rules (*e.g.*, the individual can perform more than light but less than medium"), the grids only "provide guidance for decision-making." 20 C.F.R., Pt. 404, Subpt. P, App. 2 § 200.00(d). "In any instance where a rule does not apply, full consideration must be given to all of the relevant facts of the case in accordance with the definitions and discussions of each factor in the appropriate sections of the regulations." *Id.* at § 200.00(a).

the medium exertional level.  (*See* Doc. No. 20-1 at 3–8).  The Court agrees with the Commissioner and finds that the record does support the ALJ's finding that the plaintiff was capable of performing medium exertion work.

### a.  Cardiac Factors

In support of his position that he could not perform the physical demands of medium exertion work, the plaintiff first cites to hearing testimony and treatment notes regarding his symptoms and limitations stemming from cardiac issues.  (*See* Doc. No. 19 at 8).  At the hearing, the plaintiff testified that he experienced pinching in his heart all the time, had a stent placed, and then became short of breath.  (Tr. 70).  He stated that he could not walk extended periods or do any heavy lifting, and that he could not carry groceries from the car to the house without becoming tired and appearing as though someone had pushed him.  (Tr. 70–71).  The plaintiff further testified that he did not exercise because it made him short of breath.  (Tr. 71).  The plaintiff also supports his position with citations to treatment notes from cardiologists Essam N. Nakhla, M.D. and Raghuraman Vidhun, M.D., which indicate that in 2019, the plaintiff reported experiencing excessive fatigue, which worsened despite his efforts to exercise and build endurance, even after cardiac stenting.  (Tr. 473, 484).

Despite the plaintiff's contentions, the ALJ was "not required to accept the [plaintiff]'s subjective complaints without question."  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010); *see also Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) ("If the [Commissioner's] findings are supported by substantial evidence, . . . the court must uphold the ALJ's decision to discount a claimant's subjective complaints . . .").  In fact, based on his consideration of the objective medical evidence and medical opinion evidence pertaining to the plaintiff's cardiac issues, the ALJ found that the plaintiff's subjective statements regarding the intensity, persistence, and limiting effects of his symptoms were not entirely consistent.  (Tr. 21).

The ALJ also considered that: (1) in October 2018, the plaintiff had an abnormal electrocardiogram, received a diagnosis of hypertension with borderline elevated blood pressure, and was prescribed medication (Tr. 22 (citing Tr. 488–91)); (2) the plaintiff experienced intermittent chest pain in October 2019 and had a stent placed on November 19, 2019 (*Id.* (citing 471–73)); (3) the plaintiff reported pinching pain but no shortness of breath or inability to function less than one month after the stent was placed (*Id.* (citing Tr. 484)); and (4) the plaintiff reported to Dr. Vidhun that he was not experiencing symptoms in September 2020 but that he was experiencing fatigue in April 2021. (Tr. 23 (citing Tr. 656–58, 722–27)).  Consequently, the ALJ concluded that the plaintiff's medical records did not reflect that the plaintiff experienced intense symptomology during the relevant period, and noted that the plaintiff managed his coronary artery disease with medication.  (Tr. 27); *see* 20 C.F.R. §§ 404.1529(c)(3)(ii), (iv), (v) (directing that an ALJ's evaluation of a claimant's subjective complaints include consideration of the frequency and intensity of a claimant's symptoms and the effectiveness of medication and other treatment).

The Court finds that the ALJ's conclusion is supported by substantial evidence.  Notably, for the first year of the relevant period, the plaintiff consistently denied chest pain and shortness of breath.  Indeed, during three separate visits with Dr. Krosi, the plaintiff's primary care physician, between October 24, 2018, and September 4, 2019, the plaintiff reported that he was not experiencing chest pain or dyspnea (shortness of breath).  (Tr. 377, 383, 386, 555).  Similarly, during an October 11, 2018 visit with his cardiologist, Dr. Vidhun, the plaintiff denied any chest pain or shortness of breath (Tr. 429), and during an October 23, 2018 visit with Dr. Paul Feuerstadt, a gastroenterologist, the plaintiff was negative for dyspnea (Tr. 445).  On November 19, 2019, Dr. Vidhun placed a stent in the plaintiff's artery (*see* Tr. 471), and on December 9, 2019, the plaintiff reported that, although he experienced a pinching pain and fatigue, he was functionally active with

no shortness of breath (*see* Tr. 484). In January 2020, the plaintiff again reported feeling well with no chest pain, discomfort, shortness of breath, or fatigue, and in March 2020, the plaintiff reported intermittent pinching in his chest and fatigue but otherwise presented normally on examination. (Tr. 465, 480–81, 534–35).

Between March 2020 and February 2021, the plaintiff again reported feeling well, and was taking medication for chest pain. (Tr. 624–25, 565, 673, 699, 706, 711, 713, 716). He denied experiencing chest pain, discomfort while engaging in daily activities, or dyspnea during this time, and reported feeling low energy once per week. (*Id.*). The plaintiff also reported taking daily walks with his wife and regularly riding his bicycle. (Tr. 633, 699, 673). In June 2020, Dr. Ramirez reviewed the plaintiff's medical records and found that the plaintiff could perform medium exertion work with postural and environmental limitations, as well as occasional overhead reaching, despite suffering from chronic ischemic heart disease. (Tr. 104–106). In April 2021, the plaintiff reported feeling fatigued but denied experiencing chest discomfort while engaging in daily activities or using medication for chest pain. (Tr. 725).

The Court finds that these medical records plainly provide substantial evidence supporting the ALJ's finding that the plaintiff should be restricted from heavy exertion due to his cardiac impairments as exacerbated by obesity, as well as the ALJ's resulting formulation of the plaintiff's RFC, in which he determined that the plaintiff could perform medium exertion work.

#### b. Orthopedic Factors

The plaintiff also supports his position by again citing to hearing testimony and treatment notes concerning his symptoms and limitations stemming from orthopedic issues, namely, arthritis and chronic pain. (*See* Doc. No. 19 at 8–9). At the hearing, the plaintiff testified that physical therapy had been unsuccessful in alleviating his chronic pain, and that because of the pain in his right shoulder and neck, he could not lift anything heavier than five to ten pounds, and could not

otherwise cook or do yard work or laundry.  (Tr. 72–73).  The plaintiff further contends that his physical therapy treatment notes reflect these problems with "activities of daily living."  (Doc. No. 19 at 9 (citing Tr. 682–84, 696, 703)).

Once again, despite the plaintiff's contentions, the ALJ was "not required to accept the [plaintiff]'s subjective complaints without question."  *Genier*, 606 F.3d at 49; *see also Aponte*, 728 F.2d at 591.  Here, in addition to the plaintiff's testimony (*see* Tr. 27), the ALJ also considered that: (1) on October 24, 2018, the plaintiff reported that he had experienced neck and upper back pain for a while, and that despite doing physical therapy for one year, it had not helped; (2) on October 24, 2018 and December 5, 2018 primary care physician Zife Krosi, MD observed very tight upper back muscles and "traps"; (3) an October 25, 2018 x-ray of the cervical spine was unremarkable; (4) on July 3, 2019, the plaintiff again reported neck pain to Dr. Krosi and requested a referral for physical therapy; (5) on September 18, 2020, Dr. Vidhun noted that the plaintiff reported no chest pain, no neck pain, and no left arm pain; and (6) physical therapy records from September 23, 2020 indicate that the plaintiff attended seventeen physical therapy visits regarding his orthopedic issues and reported feeling better, but still continued to have occasional bouts of high intensity pain.  (*See* Tr. 22–23).

The ALJ concluded that the plaintiff's medical records did not reflect that the plaintiff experienced intense symptomology during the relevant period, and further noted that the record reflects an extremely conservative course of treatment regarding the plaintiff's neck and shoulder. (Tr. 27).  More specifically, the ALJ emphasized that the plaintiff only sought physical therapy as treatment, that the plaintiff's cervical x-ray was normal, and that the plaintiff never sought an x-ray of his shoulder, nor did he undergo any MRIs, or any imaging showing any impairment in the neck/shoulder.  (*Id.*).  Here, the Court again finds that, in light of the foregoing considerations,

substantial evidence plainly supports the ALJ's conclusions, as well as the ALJ's resulting formulation of the plaintiff's RFC, in which he determined that, despite the plaintiff's orthopedic issues, he could perform a reduced range of medium work, with further limitation regarding overhead reaching.

### 2.    The Plaintiff's Non-Exertional Limitations

The plaintiff next contends that, in formulating his RFC, the ALJ erred by failing to adequately consider his off-task behavior and inability to handle social demands and interactions. (Doc. No. 19 at 10).  Once again, in support of his position, the plaintiff cites to his hearing testimony regarding his symptoms and limitations, and in particular, his inability to concentrate or focus.  (*See id.* (citing Tr. 68)).  At the hearing, the plaintiff testified that he does not like people around him, has nightmares, sometimes sees shadows or people, and gets agitated very quickly, particularly when somebody asks him too many questions.  (Tr. 68–69).  The plaintiff also testified that he has been fired from work due to arguments with his boss, as well as an inability to focus and finish jobs on time.  (Tr. 70).  Despite the plaintiff's contentions, the Court again emphasizes that the ALJ was "not required to accept the [plaintiff]'s subjective complaints without question" and, in fact, is expressly permitted to "exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." *Genier*, 606 F.3d at 49 (citing *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979)); *see also Aponte*, 728 F.2d at 591.

Here, in addition to the plaintiff's testimony (*see* Tr. 21), the ALJ also considered that: (1) initial treatment for the plaintiff's depression, PTSD, and ADHD was not particularly effective, as the plaintiff experienced issues with treatment compliance, and reported little change in mood, anxiety, and self-esteem (Tr. 24 (citing Tr. 560); (2) as of November 2019, the plaintiff was determined to have maximized the benefit of weekly, individual therapy, and was functioning well,

29

having demonstrated stable mood and use of coping skills (*Id.* (citing Tr. 549–50)); (3) from November 2019 to March 2020, the plaintiff continued to maintain his therapeutic gains, denied depressed mood and sadness, was less distracted, able to stay on task, was finishing projects, and was less impulsive (*Id.* (citing Tr. 533, 542); (4) in June 2020, the plaintiff indicated he was struggling to maintain therapeutic gains and reported a major depressive episode lasting three weeks, characterized by low mood, anhedonia, amotivation, fatigue, hypersomnia, increased irritability, and anxiety (Tr. 25 (citing Tr. 630–31, 635)); (5) in August 2020, and again in November 2020, December 2020, and February 2021, the plaintiff reported being able to regain and maintain his therapeutic progress, and control his depression and irritability, and denied any concerns with attention/concentration (Tr. 25–26 (citing Tr. 669–75, 705–07, 711–12)); and (6) as of April 27, 2021, the plaintiff had started to again experience an increase in depression and trauma symptoms, as well as difficulty completing his daily activities and maintaining focus (Tr. 26–27 (citing Tr. 734–35)).

Consequently, the ALJ concluded that the plaintiff's medical records indicated that psychotherapy and medication management generally controlled the plaintiff's psychiatric symptomatology—including irritability and difficulty concentrating—throughout the period at issue, aside from two separate three-week periods in June 2020 and April 2021. (Tr. 19, 29–30). In other words, the ALJ concluded that, even if the limitations described by the plaintiff during his testimony existed, the medical records demonstrated that the plaintiff effectively managed these limitations through medication and therapy. Moreover, the medical records do not support the plaintiff's characterization of his alleged limitations regarding off-task behavior and his inability to handle social demands and interactions. In light of the foregoing, the Court finds that the ALJ's resulting formulation of the plaintiff's RFC, in which he determined that the plaintiff could still

perform simple tasks and tolerate simple and basic changes to his work routine, was plainly supported by substantial evidence.  (*See* Tr. 20).

### 3.    The ALJ Did Not Fail to Meet His Duty to Develop the Record

The plaintiff further appears to contend, in objecting to the ALJ's RFC formulation, that the ALJ failed to adequately develop the record, causing him to minimize the opinions of the plaintiff's treating physicians regarding the plaintiff's non-exertional limitations.[11]  (*See* Doc. No. 19 at 11–12).  More specifically, the plaintiff asserts that, in assessing the plaintiff's mental impairments, the ALJ merely relied on 90-day treatment plan reviews rather than contemporaneous treatment notes to find that "therapy and medication management controlled symptomology throughout the period at issue, aside from a three-week period around June 2018 and in April 2021."  (*Id.* at 11 (citing Tr. 30)).  The plaintiff further contends that, although the ALJ correctly identified that, except for a November 2019 transfer note, "the record reflects no further contemporaneous treatment notes from Dr. Stern," the ALJ failed to develop the record by seeking the missing notes from Dr. Stern and Staywell.  (*Id.* at 11 (citing Tr. 29)).  In response, the Commissioner argues that the record does not suggest that any additional treatment records from Dr. Stern exist, and even if they did, the ALJ did not err by relying exclusively on the treatment plan reviews.  (*See* Doc. No. 20-1 at 13).  Once again, the Court agrees with the Commissioner, and finds the plaintiff's arguments unconvincing, for several reasons.

---

[11]  The plaintiff also broadly argues that the ALJ "cherry picked less favorable medical opinions."  (*See* Doc. No. 19 at 2).  More specifically, the plaintiff contends that the ALJ improperly "minimized the relevant and restrictive portions" of the medical opinions of Dr. Phillips and Dr. Stern, "in the context of an incomplete treatment record."  (*Id.* at 11).  Insofar as this argument can be construed as challenging the ALJ's development of the record, for the reasons described *infra*, the Court finds that the ALJ did not fail to meet his obligation to develop the record, and did not otherwise err by relying on treatment plan reviews.  Moreover, the ALJ's evaluation of Dr. Stern and Dr. Phillips' medical opinions as "somewhat persuasive" was largely based on a finding that their opinions as to the plaintiff's non-exertional limitations were inconsistent with the record evidence (*see* Tr. 29–30), which indicates that therapy and medication management controlled the plaintiff's symptomatology throughout the period at issue.

A "hearing on disability benefits is a non-adversarial proceeding," and as such, "the ALJ generally has an affirmative obligation to develop the administrative record." *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) (citation omitted).  This duty exists even when, as in this case, the claimant is represented by counsel. *Id.* (citation omitted); *see also Burgess*, 537 F. 3d at 128.  The ALJ's obligation to develop the record exists "when additional information is needed due to the vagueness, incompleteness, or inconsistency of the treating source's opinion." *Moreau v. Berryhill*, No. 3:17 CV 396 (JCH), 2018 WL 1316197, at *11 n.6 (D. Conn. Mar. 14, 2018) (multiple citations omitted); *see* 20 C.F.R. § 404.1520b(b)(2)(i).  However, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (internal quotation marks omitted).

The Second Circuit has recently suggested that an ALJ must "make a searching investigation of the record" when evaluating a potentially inadequate administrative record in the context of a claimant who is cognitively impaired. *See Lundie v. Kijakazi*, No. 21-1203-CV, 2022 WL 1154122, at *2 (2d Cir. Apr. 19, 2022) (summary order); *see also Shand v. Colvin*, No. 3:15 CV 761 (JGM), 2018 WL 389179, at *14 (D. Conn. Jan. 12, 2018) ("[t]he duty to develop the record is heightened in cases where the claimant is mentally impaired.").  However, any such heightened obligation to investigate is not *per se* triggered when the administrative record simply references materials that are not before the ALJ.  *See, e.g.*, *Cassandra S. v. Kijakazi*, No. 3:22 CV 328 (MPS) (RMS), 2023 WL 2867068, at *9 (D. Conn. Jan. 30, 2023) ("*Lundie* cannot stand for the proposition that merely having another treating source mentioned in the administrative record automatically commands an ALJ to investigate and obtain their records.").

a.      **The Plaintiff Has Failed to Identify an Obvious Gap in the Administrative Record**

As an initial matter, it is not apparent from either the plaintiff's own submissions, or the treatment notes in the record, that there are additional records of the plaintiff's treatment with Dr. Stern.   Indeed, APRN Pappas is the only psychiatric treatment provider at Staywell that the plaintiff listed in his Disability Report on July 19, 2019.[12]   (*See* Tr. 267).   Additionally, certain treatment notes contained in the record suggest that Dr. Stern merely supervised the individual behavioral health providers who treated the plaintiff.   (*See, e.g.*, Tr. 460).   Indeed, treatment notes reflect that Ms. Murray took over the plaintiff's behavioral health treatment from APRN Pappas on July 16, 2019, and upon thereafter completing and signing the Mental Impairment Questionnaire ("MIQ") on July 30, 2019, simply sought a supervising doctor's signature on the questionnaire, consistent with its instructions.   (*See* Tr. 460, 561).   Dr. Stern's signature on the MIQ suggests that, while he may have supervised Ms. Murray, he did not treat the plaintiff himself. (*Id.*).

In any event, it is clear based on the foregoing that there does not appear to be any "obvious gap[] in the administrative record."   *See Rosa*, 168 F.3d at 79.   Moreover, despite the plaintiff's mental impairments, the ALJ was not under any heightened obligation to investigate the administrative record solely because it lacked contemporaneous treatment notes from a provider (*i.e.*, Dr. Stern) who does not appear to have ever individually treated the plaintiff.   *See Cassandra*, 2023 WL 2867068 at *9.   As such, the Court finds that the ALJ did not fail to meet his obligation to develop the record as it pertains to his assessment of the plaintiff's non-exertional limitations.

---

[12] Records from Staywell indicate that the plaintiff was also treated by APRN Daedly Potusek.  (*See* Tr. 25 (citing Exhibit 11F)).  However, APRN Potusek is not listed in the plaintiff's Disability Report (*see* Tr. 261–268).

> **b.** **The ALJ Did Not Err by Relying Exclusively on Treatment Plan Review Notes in Evaluating the Plaintiff's Non-Exertional Limitations**

Even assuming the existence of additional, contemporaneous treatment records from Dr. Stern, the Court further finds that the ALJ did not err by nevertheless relying exclusively on the 90-day treatment plan reviews.

"When an unsuccessful claimant files a civil action on the ground of inadequate development of the record, the issue is whether the missing evidence is significant, and plaintiff bears the burden of establishing such harmful error." *Erma I. v. Kijakazi*, No. 3:21 CV 896 (RMS), 2022 WL 17337792, at \*9 (D. Conn. Nov. 30, 2022) (citing *DeMico v. Berryhill*, No. 3:17 CV 805 (SALM), 2018 WL 2254544, at \*7 (D. Conn. May 17, 2018)); *see also Jennifer Lynn E. v. Kijakazi*, No. 3:20 CV 695 (TOF), 2021 WL 4472702, at \*6 (D. Conn. Sept. 30, 2021) ("The plaintiff in a civil action must show that he was harmed by the alleged inadequacy of the record."). "To demonstrate such harm, a plaintiff must show that the additional medical reports would undermine the ALJ's decision, because mere conjecture or speculation that additional evidence might have been obtained in the case is insufficient to warrant a remand." *Lynn E.*, 2021 WL 4472702 at \*6 (internal citations and quotations omitted).

Here, the plaintiff wholly fails to articulate what additional information might be contained in any purportedly missing contemporaneous treatment records from Dr. Stern, much less whether or how any such additional information would have altered the ALJ's decision. *See, e.g.*, *Reices-Colon v. Astrue*, 523 F. App'x 796, 799 (2d Cir. 2013) (finding no error in the ALJ's development of the record when the plaintiff failed to identify the specific missing records, or otherwise explain how those purported missing records would have affected her case). Moreover, the Court emphasizes that the ALJ's assessment of Dr. Stern's medical opinion as only "somewhat persuasive" was not based upon a lack of contemporaneous treatment notes from Dr. Stern. (*See*

Tr. 29).  Indeed, the ALJ's assessment appears to be largely grounded in the inconsistency between Dr. Stern's opinion and the record.  (*Id.*).  In other words, that the record did not contain contemporaneous treatment notes from Dr. Stern does not appear to have been a dispositive factor in the ALJ's credibility assessment.  Further, as discussed above, the existing medical evidence in the record provides substantial support for the ALJ's assessment as to the plaintiff's non-exertional limitations and ensuing RFC formulation.  Accordingly, the Court finds that, even assuming the aforementioned error in the ALJ's development of the administrative record, the plaintiff has failed to demonstrate any resulting harm.

**B.    The ALJ's Finding at Step Five Appropriately Relies on VE Lerner's Testimony**

At Step Five, having already found that the plaintiff could only occasionally reach overhead with his bilateral upper extremities, the ALJ nevertheless determined that the plaintiff could perform the following three medium exertional jobs existing in the national economy: (1) Hand Packager (DOT 920.587-018); (2) Machine Packager (DOT 920.685-078); and (3) Food Service Worker – Hospital (DOT 319.677-014).  (*See* Tr. 32).  In doing so, the ALJ relied on the testimony of VE Lerner.  (*Id.*).  At the hearing, VE Lerner testified that the Hand Packager position involves constant reaching outwards and lifting below the shoulder, and that the Machine Packager and Food Service Worker (Hospital) positions require frequent reaching. (Tr. 81).  Similarly, the DOT lists each of the foregoing jobs as requiring more than occasional reaching.  (*See* Tr. 81). However, VE Lerner also testified that the DOT "does not deal with occasional *overhead* reaching" (emphasis added), and as such, he relied on his "40 years of job placement and employer sampling experience" in determining that an individual with the plaintiff's age, education, work experience, and RFC could perform the aforementioned occupations.  (Tr. 79).  VE Lerner did not testify as to

whether the Machine Packager and Food Service Worker (Hospital) positions require frequent *overhead* reaching.

The plaintiff contends that the Commissioner did not meet his burden at Step Five, insofar as the jobs identified by the ALJ have exertional demands "beyond those permitted in the RFC's description." (Doc. No. 19 at p. 13).  More specifically, the plaintiff argues that the jobs identified by the ALJ require more than occasional reaching, and the ALJ should not have accepted the VE's testimony, insofar as it was in conflict with the DOT and otherwise unsupported. (*Id.* at pp. 13–15).  In response, the Commissioner argues that the ALJ properly elicited testimony regarding the conflict between the VE's testimony and the DOT's silence as to *overhead* reaching, and that the VE's testimony otherwise supported the ALJ's finding. (*See* Doc. No. 21 at pp. 15–18).

A Social Security Administration Policy Interpretation Ruling governs the Commissioner's assessment of whether a job can accommodate a claimant's limitations.  SSR 00-4p, 2000 WL 1898704, at *2 (Dec. 4, 2000).  The Commissioner "rel[ies] primarily on the Dictionary of Occupational Titles . . . for information about [a job's] requirements" but "may also use [VEs] . . . to resolve complex vocational issues."  *Id.*  If the ALJ considers the testimony of a VE, then he must be alert to the possibility of "apparent unresolved conflict[s]" between the VE's testimony and the DOT. *Id.*  When a VE testifies about the requirements of a job or occupation, the ALJ "has an affirmative responsibility to ask about any possible conflict between that VE . . . evidence and information provided in the DOT." *Id.*; *see also Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87, 92 (2d Cir. 2019).  Specifically, an ALJ must "[a]sk the VE . . . if the evidence he or she has provided conflicts with information provided in the DOT; and [i]f the VE's . . . evidence appears to conflict with the DOT, the [ALJ] will obtain a reasonable explanation for the apparent conflict."  SSR 00-4p, 2000 WL 1898704 at *2.

Here, as a threshold matter, the Court notes that the DOT's silence as to occasional *overhead* reaching does not create the conflict that the plaintiff suggests.  *See Peter W. v. Comm'r of Soc. Sec.*, No. 6:20 CV 1551 (TWD), 2022 WL 523744, at *11 (N.D.N.Y. Feb. 22, 2022) ("Where . . . the DOT is silent on an issue, there is no actual conflict between the VE testimony and the DOT.").  Consequently, for this reason alone, the plaintiff's argument is ineffective.

Nevertheless, even assuming a conflict, the Court is satisfied that the ALJ complied with SSR 00-4p in reconciling the VE's testimony that an individual with the plaintiff's age, education, work experience, and RFC could perform the cited occupations, with the DOT's silence as to occasional *overhead* reaching.  Indeed, the ALJ elicited testimony from VE Lerner regarding this purported conflict, and subsequently obtained a reasonable explanation, namely, that while the DOT is silent as to occasional *overhead* reaching, based on the VE's experience, the occupations cited could still be done with a limitation to occasional overhead reaching.

The Court acknowledges a degree of ambiguity as to the degree and frequency of overhead reaching required by the Machine Packager and Food Service Worker (Hospital) positions. Indeed, the Court finds that VE Lerner's testimony does not effectively reconcile the potential conflict between the DOT's listing of these occupations as requiring constant and/or frequent reaching, and his determination that, nevertheless, an individual with the plaintiff's age, education, work experience, and limitation to only occasional overhead reaching could still perform these jobs.  However, VE Lerner did testify that while, per the DOT, the occupations cited each required constant and/or frequent reaching, based on his experience, the Hand Packager position involved only lifting at waist level and not above the shoulder (*i.e.*, not *overhead* reaching).  (Tr. 79–81). As such, even if the Machine Packager and Food Service Worker (Hospital) positions' ambiguous reaching requirements rendered the alleged conflict unresolved as to those occupations, the VE's

testimony that the Hand Packager occupation did not require any overhead reaching obviates any such concern. *See Lockwood*, 914 F.3d at 94 ("It may well be that the apparent conflict between the [VE's] testimony and the [DOT] is susceptible to easy resolution—if, for example, the reaching involved in the three jobs at issue consists exclusively of lateral or downward reaching."); *see also Edwards v. Berryhill*, No. 3:17 CV 298 (JCH), 2018 WL 658833, at *15 (D. Conn. Jan. 31, 2018) (ALJ required to "identify only *one* job existing in significant numbers") (emphasis in original); *Debiase v. Saul*, No. 3:19 CV 68 (RMS), 2019 WL 5485269, at *10 (D. Conn. Oct. 25, 2019) ("[C]ourts are generally guided by numbers that have been found 'significant' in other cases, and courts within the Second Circuit have generally found that what constitutes a 'significant' number of jobs is fairly minimal.") (internal citations and quotations omitted).

For the foregoing reasons, the Court finds that the ALJ reasonably relied on the VE's testimony in concluding that the plaintiff could perform other work existing in significant numbers in the national economy.[13]

The Court also finds the plaintiff's remaining contentions to be unavailing. As an initial matter, the Court agrees with the Commissioner that the ALJ was not obligated to inquire "when and where" VE Lerner observed the cited occupations being performed with only occasional overhead reaching (*see* Doc. No. 19 at 14; Doc. No. 20 at 17). The Court similarly disposes of the plaintiff's argument that VE Lerner "did not have the expertise or the data to opine to job numbers, and the ALJ should not have accepted his testimony about this factor." (Doc. No. 19 at 14). "Assuming no demand [for supporting data], a vocational expert's testimony may count as

---

[13] In his decision, the ALJ noted that the plaintiff's RFC "more than account[s] for the limitations that the record is able to support regarding musculoskeletal neck/shoulder impairments as exacerbated by obesity." (Tr. 30–31). The Court agrees. As the ALJ emphasized, the plaintiff's conservative course of treatment as demonstrated by the physical therapy records, as well as the absence of any imaging showing a musculoskeletal impairment, supports the ALJ's formulation of the plaintiff's RFC.

substantial evidence even when unaccompanied by supporting data." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1155 (2019) (expressly rejecting a proposed categorical rule by which a VE's testimony is precluded from qualifying as "substantial" if the VE had declined an applicant's request to provide supporting data).  Moreover, "[e]ven without specific data, an applicant may probe the strength of testimony by asking an expert about (for example) her sources and methods—where she got the information at issue and how she analyzed it and derived her conclusions." *Id.* at 1156. It follows that SSR 00-4p does not impose a heightened duty upon the ALJ to probe the strength and rationale of the data or expertise underlying the VE's testimony.

Here, given the DOT's silence as to overhead reaching, the ALJ premised his determination at Step Five, in part, on VE Lerner's testimony, noting that VE Lerner relied upon his professional experience in weighing the plaintiff's reaching limitations.  (Tr. 32).  Moreover, at the hearing, plaintiff's counsel expressly stated that he did not have any objections to VE Lerner's qualifications, and otherwise declined to cross-examine VE Lerner regarding his experience.  (*See* Tr. 75, 82–83).  VE Lerner testified, without challenge, about his 40 years of experience as a vocational expert.  (*See* Tr. 355).  He explained clearly the fact that the DOT did not address any potential physical limitation for overhead reaching.  (Tr. 79).  He further explained how his conclusions regarding what jobs the plaintiff could perform, which would allow for only occasional overhead reaching, derived from both the DOT and his professional experience as a vocational expert.  (*Id.*).  The ALJ was permitted to rely on this testimony in reaching his Step Five determination.

**V.      CONCLUSION**

The plaintiff's motion for an order reversing or remanding the Commissioner's decision (Doc. No. 18) is **DENIED**.  The Commissioner's motion to affirm that decision (Doc. No. 20) is **GRANTED**.

This is not a Recommended Ruling. The consent of the parties permits this Magistrate Judge to direct the entry of a judgment of the District Court in accordance with the Federal Rules of Civil Procedure. Appeals from this judgment can be made directly to the appropriate United States Court of Appeals.  *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

The Clerk of Court shall enter judgment and close this case.

It is so ordered this 1st day of September, 2023, at New Haven, Connecticut.

                                                     /s Robert M. Spector, U.S.M.J.
                                                     ROBERT M. SPECTOR
                                                     UNITED STATES MAGISTRATE JUDGE